1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8
9    NIKKI RUSSELL,                  CASE NO. 1:09-cv-01919-SMS

10                Plaintiff,

11      v.                          ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER

12    MICHAEL ASTRUE,
     Commissioner of Social Security,

13
               Defendant.

14    _____/

15
16       Plaintiff Nikki Russell seeks judicial review of a final decision of the Commissioner of

17 Social Security ("Commissioner") denying her application for supplemental security income

18 ("SSI"), pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").

The matter is currently before the Court on the parties' cross-briefs, which were submitted,

19 without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]

20 Following a review of the complete record and applicable law, this Court finds the decision of

21 the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a

22 whole and based on proper legal standards.  Accordingly, this Court denies Plaintiff's appeal.

23 ///
24 ///
25 ///
26 ///
27
28

     [1]  Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 8 & 9).

I. **Administrative Record**

    A.     **Procedural History**

On June 19, 2002, Plaintiff filed an application for a period of disability, disability insurance benefits, and supplemental security income (SSI) for a disability beginning April 3, 2001.

Plaintiff appeared and testified at a hearing on October 29, 2003.  Following the hearing, the ALJ requested, and received reports of, two consultative examinations, including a psychological examination by Kimball Hawkins, Ph.D.  In his decision dated June 2, 2004, Administrative Law Judge Rocklin D. Lyons denied Plaintiff's application, electing not to rely on Hawkins' opinion since it was "shown to be incorrect by the evidence."

While the appeals for her initial application proceeded, Plaintiff filed an application for SSI benefits only on June 17, 2004.

On July 16, 2004, the Appeals Council vacated the ALJ's decision and remanded the 2002 application for further proceedings, directing the ALJ (1) to evaluate Plaintiff's mental impairment according to the special psychiatric technique, (2) to give consideration to the consultative psychological evaluation performed by Kimball Hawkins, Ph.D., on November 17, 2003; and (3) to obtain evidence from a vocational expert, if needed.  ALJ James E. Ross held a video hearing on April 14, 2005, which included testimony by vocational expert Cheryl Chandler.  Although ALJ Ross held the record open until May 27, 2005, for 48 additional pages of medical evidence which Plaintiff was to have submitted, nothing additional was filed.

ALJ Ross denied the remanded 2002 application on June 27, 2005.  On August 19, 2005, the Appeals Council denied Plaintiff's request for review.  Plaintiff appealed the agency decision to this Court on October 20, 2005.

Plaintiff again applied for disability benefits on January 25, 2006.

On October 23, 2007, the District Court reversed the decision in the 2002 case, finding that the ALJ's decision was not supported by substantial evidence, and remanded the case to the Commissioner for further proceedings.  On December 17, 2007, the Appeals Council remanded

///

1  the case to an Administrative Law Judge for further proceedings consistent with the District
2  Court's order.

3      On May 2, 2008, ALJ Stephen W. Webster conducted a hearing to address the remand
4  orders of the U.S. District Court and the Administrative Council as well as Plaintiff's appeal of
5  the agency's denial of her 2006 application.  Adjudicating all pending appeals, ALJ Webster
6  denied Plaintiff's applications for benefits in a written decision dated May 24, 2008.

7      The Administrative Council denied review on August 31, 2009.  On October 30, 2009,
8  Plaintiff filed a complaint seeking this Court's review (Doc. 1).  Plaintiff says her appeal "rel[ies]
9  almost exclusively on her mental impairments, which are borderline intellectual functioning,
10  depression, and anxiety."  Doc. 14 at 3.  She does not challenge ALJ Webster's findings that her
11  cardiac arrhythmia, GERD, and asthma are "non-severe," and that no medical evidence supported
12  Plaintiff's claims of Bell's palsy and carpal tunnel syndrome.  Nor does she challenge ALJ
13  Webster's findings that, despite intermittent lower back pain and obesity, Plaintiff retained the
14  residual functional capacity to perform light work.  In fact, she does not address her alleged
15  physical impairments at all.

16      **B.    Factual Record**

17      Because Plaintiff (born October 8, 1972) focuses this appeal on her alleged psychological
18  disabilities, this decision will not address matters in the record relating to her physical disabilities
19  except to the extent that they relate to Plaintiff's psychological condition.  Plaintiff's medical
20  records reflect a diagnosis of "generalized anxiety" throughout the administrative record.  She
21  also has a history of drug and alcohol abuse, now reportedly in remission.

22      Plaintiff is five feet, five inches tall.  In the approximately ten years that her disability
23  claims were pending, her weight averaged about two hundred pounds.

24      Plaintiff has a twelfth-grade education.[2]  She has worked a variety of jobs, primarily in
25  fast food and retail establishments including Walmart, Carls, Jr., Target, Rally's, and Sparkle
26  Cleaners, as a cook and a cashier.  Plaintiff has also worked as a child care provider and a file

27
28      [2]  Plaintiff sometimes reported her education as regular high school through tenth grade plus "continuation
   school."  She denied graduating from high school or receiving a GED.

clerk.  She worked longest as a cook and food preparer, where she was a lead worker.  She was a supervisor at Rally's.

Her family and living situation has changed several times in the nearly ten-year course of her efforts to secure disability benefits.  She was married to Darien Fears, the father of several of her children, from January 1994 through January 1997.  During the course of her disability applications, she divorced Fears and remarried.  She has six children.  Plaintiff has a history of criminal convictions, imprisonment, and probation.

**Plaintiff's disability report (June 20, 2002).**  In a disability report dated June 20, 2002, Plaintiff reported that she suffered from "social and generalized anxiety."  Working around many people gave her panic attacks.  Her anxiety caused her to avoid work until she quit or was terminated.  She had last worked April 3, 2001, when she quit her job at Walmart due to her "other health problems and high-risk pregnancy."

**Kern County Mental Health assessment (July 5, 2002).**  Plaintiff was assessed at Kern County Mental Heath (KCMH) on July 5, 2002.  Her presenting problems were "'Constant nervousness/worry; panic attacks approx. 5 months."  In 1997, Plaintiff, a former alcohol abuser, attended two sessions of a rehabilitation program for "major de[pression] recurrent severe without psychotic features," then stopped participating.  Although Plaintiff claimed to have been sober since 1997, she disclosed eight episodes of binge drinking in the past two and a half years. Plaintiff told the counselor that, when she was alcoholic, she was able to relax and speak her mind, and the alcohol helped her sleep.  Plaintiff had no history of suicidal or homicidal ideation.

Although school had sometimes been "OK," Plaintiff had begun partying and drinking alcohol at an early age and became pregnant for the first time when she was fifteen years old. She had abused alcohol for twelve years, beginning at age 14, and marijuana for six years, beginning at age 17.  Her former husband was currently imprisoned for convictions arising from his drug dealing and gang activity.

Plaintiff's current living situation was stable.  Her current boyfriend was a good man and a good father.  She was no longer around people who abused drugs or alcohol.  All of her friends and family members would be supportive of her abstaining from alcohol and drugs.  Plaintiff

reported that she was a good money manager and could always find an odd job to keep her family fed.

Nonetheless, Plaintiff had several sources of stress. Plaintiff had five natural childbirths with one child born prematurely. In the past four years, she had three miscarriages and a caesarian section birth. She also had surgery to remove an "ovarian tube" which had a cyst, Bell's palsy, and asthma. Plaintiff lived in a violent neighborhood known for drive-by shootings.

Interviewer May Kent, MFT, commented that Plaintiff was fully oriented and soft spoken, demonstrating normal mood, appropriate affect, below normal intelligence, and fair insight and judgment. Kent diagnosed:

Axis I        Generalized Anxiety Disorder (300.02)
              R/O Alcohol Abuse

Axis II:      799.9

Axis III:     None stated

Axis IV:

Axis V:       Current GAF: 55          Highest GAF: UK

AR 168.[3]

Kent assessed Plaintiff as having mild financial impairment; moderate impairment of community living, community contribution, relationships with others, and educations and learning; and severe impairment of community participation, and physical and emotional health. She considered Plaintiff to be severely impaired in community participation since Plaintiff reported being "extra nervous" when many people were around. She considered Plaintiff to be severely impaired in physical and emotional health because of the many health problems Plaintiff

---

[3] The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR"). It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." Id. at 34. The first description in the range indicates symptom severity; the second, level of functioning. Id. at 32. In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings. Id. at 33.
    GAF 55 is at the midpoint of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id. at 34.

reported to the interviewer.  Treatment would include therapy to reduce anxiety and participation in a 12-step AA group, and was expected to continue for six months.

**Daily activities questionnaire (July 17, 2002).**  In a daily activities questionnaire dated July 17, 2002, Plaintiff claimed that she "toss[ed] and turn[ed] all night."  She spent the majority of her days in her bedroom and "just [didn't] feel the need or want to dress or groom [her]self."  She had trouble concentrating since she could get "real irritated."  Because her condition made her become "violent or distant," she would either decrease her hours at work or get fired.  For her last three jobs, she "just couldn't make [her]self go back."

Her cousin, daughter, or fiancé did the cooking and shopping.  She read the newspaper daily and watched music programs, the Discovery channel, and scary movies on the television.  She "hardly ever" went out, but when she did, she needed someone with her "to keep [her] nerves calm."  She cared for her six children to the best of her ability.  She talked to her mother and two sisters daily.

**Third-party daily activities report (July 17, 2002).**  In a daily activities questionnaire dated July 17, 2002, Plaintiff's cousin Tyana Larry, who lived with Plaintiff and her children, confirmed that, although she couldn't keep a schedule of Plaintiff's sleeping hours, Plaintiff woke frequently during the night.  Since Plaintiff didn't go anywhere for which she needed to dress up, she usually wore her pajamas or a T-shirt and cut-offs.  Larry did the cooking, although Plaintiff sometimes microwaved food for herself or got fast food.  Plaintiff helped "make the plates for the children just not to feel left out."  Plaintiff also made her bed, folded clothes, picked things up from the floor, and wiped counters and tables.  Because Plaintiff's fiancé worked at Walmart, he brought whatever the household needed home from work.  Plaintiff enjoyed working crossword puzzles, and loved scary movies and music.  She had stopped driving and did not like to go out alone.  On her good days, she was "the best mom."

**Psychiatric review technique (September 9, 2002).**  In a psychiatric review technique completed on September 9, 2002, by Clair Steggall, M.D., and reviewed by psychiatrist Marina C. Vea, M.D., Plaintiff was reported to have generalized anxiety disorder.  The impairment was severe but not expected to last more than twelve months.  The report noted no restriction of

activities of daily living and insufficient evidence of episodes of decompensation.  Plaintiff had mild impairments in maintaining social functioning and in maintaining concentration, persistence, or pace.

**Plaintiff's disability report (September 19, 2002).**  In a reconsideration disability report dated September 19, 2002, Plaintiff described her illness and symptoms as "worse."  She was "hardly able to care for [her]self," "going from doctor to doctor being tested for all different kinds of things to try and find out what's wrong with me."  Her condition "always" affected her ability to care for her personal needs.  Since she filed her claim, she had "distan[ced] herself from the outside, avoid[ed] doing social activities and stay[ed] very depressed."

**Plaintiff's medications (September 2003).**  In September 2003, Plaintiff reported that she was taking Flexeril (a muscle relaxant), Flecainide (heart), Lopressor (heart), Paroxetine (anxiety), Lorazepam (depression), Paxil (depression, mental), Naproxen (pain), Tagamet (stomach), Vioxx (chest pain), Darvocet (pain), and Propoxyphene APAP (heart and pain).[4]

---

[4]  Flexeril (cyclobenzapine) is used with rest and physical therapy to relax muscles and relieve pain caused by muscle injuries.  It should not be taken for more than three weeks at a time.  Side effects include drowsiness, dizziness, upset stomach, irregular heartbeat, and chest pain, among other symptoms. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699 (April 19, 2011).

Flecainide is used to prevent life-threatening irregular heartbeats.  Its description includes a warning that it has been found to increase the risk of repeat heart attack and death in individuals who have previously had heart attacks.  It increases the risk of patients with atrial fibrillation or atrial flutter developing other types of irregular heartbeats.  Its dosage must be carefully calibrated in patients who also take Lopressor and should not be used by patients who are pregnant or likely to become pregnant.  Side effects include dizziness, changes in vision, headache, weakness, uncontrollable body shaking, stomach pain, irregular heartbeat, chest pain, shortness of breath, extreme fatigue, nausea, loss of appetite, confusion, persistent cough, and swelling of extremities, among other symptoms. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000466 (April 19, 2011).

Lopressor (metoprolol) is used alone or with other medications to control high blood pressure and to treat angina (chest pain).  Side effects include dizziness, tiredness, depression, nausea, stomach pain, vomiting, gas, heartburn, constipation, shortness of breath, and irregular heartbeat.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000795 (April 19, 2011).

Paxil (paroxetene) is used to treat depression, panic disorder, social anxiety disorder, and obsessive-compulsive disorder, among other conditions.  Side effects include headache, dizziness, difficulty concentrating, nervousness, forgetfulness, confusion, sleepiness, nausea, vomiting, constipation, gas, stomach pain, heartburn weight loss or gain, pain in the back and in muscles and joints throughout the body, muscle weakness, unusual dreams, blurred vision, irregular heartbeat, chest pain, difficulty breathing, uncontrollable shaking, and unsteady walking, among other symptoms. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001037 (April 19, 2011).  It is unclear whether Plaintiff was taking both Paxil and generic paroxetene, or whether she simply listed the same medication twice.

Lorazepam is a benzodiazepine used to relieve anxiety.  It works by slowing brain activity.  Side effects include

Three different doctors had each prescribed some of these medications.

**Testimony (October 29, 2003).**  Plaintiff reported that, although she once had a driver's license, she no longer had one but could not remember why.  She denied that her license revocation related to alcohol or drug use.

Plaintiff testified that she had anxiety:

I start sweating.  I can't breath, or I'm just like real, real nervous, I stay anxious a lot anyways.  And it's just hard to function a lot.  I mean a lot, lot of people.

AR 289.

Asked whether she was seeing a psychiatrist, psychologist, or other mental health professional, Plaintiff replied:

No, my doctor, Dr. DeBarlios (Phonetic) was going to give me a referral to mental health.  He's the person that['s] been prescribing my medication, but other than mental health about - - I don't even remember when, I saw them briefly, and they wanted me to do all these different classes, and I told them it's hard for me to get out

---

drowsiness, dizziness, tiredness, weakness, diarrhea, nausea, restlessness or excitement, constipation, irregular heartbeat, and blurred vision, among other symptoms.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560 (April 19, 2011).  Ativan is a brand name for lorazepam.

Naproxen is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve pain, tenderness, swelling and stiffness caused by various types of arthritis. The description of Naproxen includes a warning that it may increase the risk or heart attacks and strokes in susceptible patients, as well as causing ulcers and stomach or intestinal bleeding.  Side effects include constipation, diarrhea, gas, mouth sores, dizziness, drowsiness, difficulty falling asleep or staying asleep, ringing in the ears, changes in vision, and back pain, among other symptoms.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526 (April 19, 2011).

Tagamet (cimetidine) is used to treat ulcers heartburn, and other stomach ailments.  It may cause diarrhea, dizziness, drowsiness, confusion, excitement, depression, or nervousness, among other things.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000628 (April 19, 2011).

Vioxx (rofecoxib) is an NSAID used to treat forms of arthritis and other types of pain.  It was withdrawn from the U.S. market in 2004 due to an increased risk of cardiovascular events, including heart attacks and strokes, among patients taking it.  www.drugs.com/vioxx.html (April 19, 2011).

Darvocet (acetaminophen and propoxyphene) is a narcotic pain reliever used to treat mild to moderate pin with or without fever.  It was withdrawn from the U.S. market in November 2010. Side effects include chest pain, confusion, stomach pain, dizziness, drowsiness, and blurred vision, among other symptoms.  www.drugs.com/vioxx.html (April 19, 2011).  It is unclear whether Plaintiff was taking both Darvocet and generic acetaminophen and propoxyphene, or whether she simply listed the same medication twice.

and catch the bus.  I don't have the adequate transportation, so I just didn't go.  I had an evaluation done through the Human Services Department, and they are the ones who referred me to mental health.

Q      Do you or your husband own a car?

A      Yes.  He does, yeah.  But at the time of the appointments we didn't.

AR 287.

Plaintiff testified that she left her job at Walmart in April 2001 due to "anxiety attacks and the high risk pregnancy."  (Her youngest child was born in September 2001.)  She experienced three or four anxiety attacks a month depending on her mood, location, or activity. Riding on the freeway gave her anxiety attacks.  Her medication relieved the anxiety within thirty minutes but left her "almost in a zombie type of mode."  Plaintiff repeatedly asserted that because the medication that relieved her anxiety left her nauseated, dizzy, and sleepy, she was unable to work.  She also quit her job because her panic attacks gave her diarrhea, which was overwhelming in view of her limited breaks on the job.

Plaintiff also had difficulty concentrating, had crying spells, and felt people around her were out to get her.  She had been suicidal and had auditory hallucinations.  When Plaintiff first went to KCMH, she was told she would be better in six months, but seven years had elapsed. Her memory was poor.

Q      Do you go to – have you been up to Mary Kay Shell or Current medical for mental health?

A      Uh-uh.  I went (INAUDIBLE) and they had me go to mental health, but they require me to go all these different places all through the week.  I didn't have the transportation.  I don't catch the bus.

Q      Okay.

A      I don't get out, and I don't – that would cause more of a panic attack to be out and about.  You know, if I (INAUDIBLE) realize I don't have some kind of medication then all of a sudden I feel that whatever I needed that medication for, that's no longer.  If I don't have my pump, I can't breath. If I don't have my pain pills, it's hurting me.  And I'm just so uncomfortable around people, I just choose not to be around them.  My children, I've been around them all their life, so they wouldn't cause me to have an anxiety attack.  They know what mood I'm in, they know when I

///

///

have whatever attitude I have to basically go in a different direction or leave me alone in my room.

AR 300.

**Hawkins' report.** On November 17, 2003, psychologist Kimball Hawkins, Ph.D., performed a psychological consultation on behalf of the agency. Plaintiff drove herself to the appointment although her drivers' license was suspended. Hawkins characterized Plaintiff as evasive, explaining that she claimed not to remember why she no longer had a driver's license and poorly reported the medications she was taking. She told Hawkins that she normally lived with her husband and six children, but that her husband was currently in prison.

Plaintiff told Hawkins that her medications made her sluggish and that people irritated her, making her avoidant. She reported a history of alcohol abuse but not drug abuse, and said that she had been alcohol free for a year. She had a history of arrests for such crimes as petty theft and assault and was once jailed for sixteen days. Hawkins described:

> [Plaintiff] is an adult female who is roughly dressed and groomed. She speaks in sentences. She is oriented to person, place, and time. There are no hallucinations reported but there are some depressive symptoms noted. She is easily agitated. She demonstrates a labile mood and sad affect. She cried easily. She has a history of suicidal thoughts. She is defensive, angry, and appears unhappy throughout the assessment. She sometimes acted bored or disinterested. She frequently appeared agitated.

AR 238.

Hawkins reported that Plaintiff was irritable and had poor impulse control. She was slightly distracted, and her immediate memory was impaired. Her intelligence was borderline. Her judgment was intact, and her associations were goal-directed. Noting her history of anxiety disorder and alcohol abuse, Hawkins opined that Plaintiff also demonstrated symptoms of a mood disorder.

Hawkins administered a battery of tests at the agency's request. Plaintiff correctly responded to 25 of 30 items on the Folstein Mini-Mental State Examination (MMSE).[5] The

---

[5] Clinicians use the MMSE as a convenient screening tool to identify mental impairment. Arun Aggarwal and Emma Kean, "Comparison of the Folstein Mini Mental State Examination (MMSE) to the Montreal Cognitive Assessment (MoCA) as a Cognitive Screening Tool in an Inpatient Rehabilitation Setting," (December 2010) in www.scirp.org/journal/PaperInformation.aspx?paperID=3467 (April 19, 2011). The MMSE, which is commonly

results of the Rey 15 Item Memory Test[6] were consistent with a conclusion that Plaintiff was not malingering.  On the whole, Plaintiff's performance on the Wechsler Adult Intelligence Scale-III produced scores in the low borderline deficit range, with Plaintiff's scores on the subtests ranging from the fourth to twelfth percentiles. Plaintiff's performance on the Bender Gestalt Test of Visual Motor Integration provided "borderline evidence to hypothesize organic brain dysfunction."  The Wechsler Memory Scale-III yielded scores in the borderline to mild deficit range, with Plaintiff's scores ranging from the 0.4 to third percentile.

Hawkins opined that Plaintiff's ability to understand, remember, and carry out complex instructions was poor, but her ability to understand, remember, and carry out simple instructions was good.  She had marginal ability to maintain concentration, attention, and persistence.  She had a fair ability to perform activities within a schedule and to maintain regular attendance.  Nonetheless, Plaintiff's avoidance, agitation, and anxiety indicated poor ability to complete a normal work week without interruptions from psychologically based symptoms.  She had marginal ability to respond appropriately to changes in the work setting.  She had fair ability to manage her finances.  Hawkins diagnosed;

| | |
|---|---|
| Axis I | h/o anxiety disorder, NOS<br>Mood Disorder, NOS<br>Alcohol abuse, remission reported |
| Axis II: | V 62.89 Borderline level of intellectual functioning |
| Axis III: | Multiple medical problems reported |

AR 241.

Hawkins recommended ongoing psychiatric treatment, counseling, and medical follow-up.

///

used as a first step in identifying dementia and similar mental disturbances in the elderly, includes such questions as, "What is the year? Season? Date? Day of the Week? Month?" and "Repeat the phrase: 'No ifs, ands, or buts.'" www.med.umich.edu/medstudents/curRes/cca/m2/2010_resources/MMSE.pdf (April 19, 2011).

[6] The Rey 15 Item Memory Test specifically tests for malingering by individuals claiming memory impairment. James A. Martin, "Qualitative Scoring of the Rey 15-Item Memory Test in a Forensic Population" (Ph.D. Dissertation, Louisiana State University, August 2002 reported at etd.lsu.edu/docs/available/etd-0611102-100354/unrestricted/Martin_dis.pdf (April 19, 2011).

**Plaintiff's disability report (July 16, 2004).**  In an adult disability report dated July 16, 2004, in addition to her physical ailments, Plaintiff reported that her "mental" kept her "from socializing or being with the public."  She again explained that her problems forced her to continually reduce her hours of work until she just left each job.  In June and July 2002, she had worked in a hospital cafeteria; in August and September 2003, she had worked as the clerk at Today's Cleaners.  Plaintiff described her physical and mental ailments as "way to[o] much to expect or try and make people understand."  In addition, her husband's ability to work was limited by his need to be close by in case Plaintiff became ill.

**Plaintiff's adult function report (March 1, 2006)**.  Plaintiff had moved from Bakersfield to Sacramento.  On a typical day, Plaintiff would wake her children for school and take her medication.  Depending on how she felt, she might do some housework, but she had "plenty of help at home."  AR 500.

Plaintiff reported that she no longer drove since she began having panic attacks while driving.  She felt uncomfortable in large groups of people or with strange people.  She was easily agitated and dozed off constantly.  She was afraid of freeways and open closet doors.  She did not trust authority figures and could not handle stress.  Although she "wr[o]te all the time," Plaintiff reported that she had a hard time concentrating for long periods of time.

In closing, Plaintiff remarked:

> My illness has caused me to live at a standstill.  I'm only comfortable in my own home and I take so much medicine that I have no desire to even be sexual with my husband.  It's a financial hardship on my family and it's draining us by the day.  I need this help, my children need this help, and it would lift a heavy burden off my husband.

AR 507.

A third party adult function report completed by Plaintiff's teen-aged daughter, Shaniece Griggs, echoed her mother's responses.

**Medical report (July 7, 2006).**  On July 7, 2006, internist Jenna Brimmer, M.D., examined Plaintiff as an agency consultant.  Plaintiff reported a medical history of depression and anxiety.  Brimmer wrote:

The claimant is not seeing a psychiatrist but is receiving psychiatric medication from her primary care physician.  She has never been hospitalized in a psychiatric facility.  She denies any auditory or visual hallucinations or any active suicidal or homicidal tendencies.

AR 592.

**Psychiatric report (July 20, 2006).**  Plaintiff told psychiatrist Timothy Canty, M.D., an agency consultant, that she had experienced a lot of depression and anxiety for about eight years. Canty saw no psychiatric records.  Plaintiff had no mental health treatment and had never been psychiatrically hospitalized.  Her family doctor prescribed Ativan, as needed, and Paxil.  Plaintiff reported taking Ativan two times per week.

Plaintiff lived with her husband and six children, ranging in age from four to seventeen years old.  She had moved to Sacramento from Bakersfield about a year earlier "to get a change of scenery."  Plaintiff's husband was unemployed, and the family supported itself with SSI benefits paid to two of the children.

Plaintiff had a criminal record including arrests for assault with a deadly weapon, petty theft, and grand theft.  She was last arrested in July 2004 for grand theft and was on probation.

Plaintiff was well-groomed.  Her speech was clear: her thought clear, logical and goal directed.  She was cooperative.  Plaintiff denied psychosis and suicidal or homicidal thoughts. She described her typical mood as irritable and anxious--easily angered and chronically on edge. She appeared slightly subdued with full affect.

Canty diagnosed:

Axis I          Anxiety Disorder NOS versus Generalized Anxiety Disorder

Axis II:        Antisocial personality traits

Axis III:       Deferred

Axis IV:        Chronic moderate

Axis V:         60/65

AR 168.[7]

---

[7]  GAF 60 is at the top of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.* at 34.

1  Canty suspected that Plaintiff's greatest difficulty was being overwhelmed by her

2  psychosocial situation.  He reported, "She did fairly well in the exam and did not appear terribly

3  anxious."  AR 599.  Canty opined:

4      She is cognitively able to manage money.  Based on her performance today, she
       could do simple, repetitive tasks.  She would probably be overwhelmed by
5      complex work.  She has worked with the public in the past and could probably do
       so currently.  She says she has had the psychiatric symptoms fairly consistently for
6      the last eight years and has had several jobs during that period.  I don't think her
       current level of symptoms would interfere with attending work she was highly
7      motivated to perform.

8  AR 599.

9      **Psychiatric Review Technique (October 5, 2006).**  H.N. Hurwitz, M.D., who conducted

10 the psychiatric review technique for the agency, considered Plaintiff to have affective disorders

11 and anxiety-related disorders.  He concluded that Plaintiff had mild restriction of activities of

12 daily living; moderate restriction both in maintaining social functioning and in maintaining

13 concentration, persistence and pace; and no episodes of decompensation.  Moderate limitations

14 included ability to carry out detailed instructions, ability to maintain attention and concentration

15 for extended periods, ability to interact appropriately with the general public, and ability to set

16 realistic goals or make plans independent of others.  Plaintiff was not significantly limited in any

17 other area of assessment.  Hurwitz opined that Plaintiff could work in a variety of settings, could

18 interact adequately with coworkers and supervisors, but could not interact with the general

19 public.

20     **Plaintiff's disability report (February 20, 2008).**  Plaintiff continued to live in

21 Sacramento, where her immediate family shared housing with extended family members.

22 Plaintiff wrote of her mental problems:

23     I don't socialize.  I am not comfortable if I leave my house without my
       medications.  I have trouble concentrating and staying focused.  I get bad mood
24     swings.  I get overwhelmed and lock myself in my room.  There are 8 children and
       2 other adults in the home and I can't handle the noise sometimes.  I feel pressure
25     every day and I don't want to spend the day popping pills or hurt the people I love.

26 ─────────────

27     GAF 65 is at the midpoint of the range GAF 61-70, which indicates "Some mild symptoms (e.g., depressed
   mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy,
28 or theft within the household), but generally functioning pretty well, has some meaningful interpersonal
   relationships."  *Id.* at 34.

I get dizzy, faint, and sick when I leave the house, I'm so uncomfortable.  I have low self esteem.

AR 478.

Plaintiff reported that she had "an unsuccessful work attempt because of my disabilities." AR 478.  She worked as a child care provider six hours a day, four days a week from 2003 to 2005.  She had also provided in-home child care two days each week in January and February 2005.

**Plaintiff's testimony (May 2, 2008).**  Plaintiff spent her days watching television (about three hours daily), reading ("a lot"), and playing a card game on the computer.  Three of her children were teenagers and able to help around the house as needed.  The family rented movies to watch at home.  Plaintiff was able to attend church if she wanted to.  She visited with her grandmother.

Plaintiff was currently working four days a week in the kitchen of a convalescent home. In 2007, she worked at Popeye's Chicken for five months but had so many doctor's appointments that she just stopped working.  In 2005, she worked for two or three weeks at Subway before she got sick and quit.

Plaintiff had a criminal record.  She was last in jail for a month in December 2004.

## II.   Discussion

### A.    Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

## B.   Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

Step one:    Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two:    Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three:   Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four:   Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five:   Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

16

1    ALJ Webster found that Plaintiff had not engaged in substantial gainful activity since the

2   alleged onset date of April 3, 2001.[8]  Her severe impairments included mechanical low back pain,

3   obesity, borderline intellectual functioning, and an anxiety disorder.   The ALJ concluded,

4   however, that none of Plaintiff's impairments met or equaled an impairment listed in 20 C.F.R.

5   Part 404, Subpart P. Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).   Although

6   Plaintiff had held various unskilled and semiskilled positions, she had not remained at any job

7   long enough for her past employment to be relevant.   The ALJ found that Plaintiff had residual

8   functional capacity to perform light work: to lift and carry twenty pounds occasionally and ten

9   pounds frequently, and to stand, walk, and sit six hours in an eight-hour work day, and that

10   Plaintiff had the mental capacity to understand, remember, and carry out simple repetitive tasks.

11        **C.    Did ALJ Webster fail to properly evaluate Hawkins' opinions?**

12        The basis of Plaintiff's appeal is simple: if one accepts Hawkins' opinions about

13   Plaintiff's mental impairments, Plaintiff must be found disabled.   This is because, after her

14   attorney posed a hypothetical question setting forth Hawkins' summary of Plaintiff's mental

15   impairment, the vocational expert opined that no job would be available for an individual with

16   such impairments.   Because Plaintiff sought minimal psychological treatment before and after

17   Hawkins' evaluation and because Canty found Plaintiff to function nearly normally, ALJ

18   Webster explicitly rejected Hawkins' opinion that Plaintiff's abilities to concentrate, maintain a

19   schedule, manage stress, and adapt to change rendered Plaintiff unemployable.

20        In her sole point on appeal, Plaintiff contends that ALJ Webster erred in rejecting

21   Hawkins' opinion as inconsistent with Plaintiff's "minimal level of psychiatric treatment" before

22   and after Hawkins evaluated Plaintiff, pointing to the consistent references to anxiety and

23   depression in her medical records and her family doctor's prescribing her Paxil,  She adds that

24   the ALJ erred in relying on Canty's depiction of Plaintiff as having seemingly normal mental

25   status and behavior.

26

27        [8]  ALJ Webster acknowledged that Plaintiff had worked since her initial application but found that the
28   income from her various 4-day-a-week jobs consistently fell just below the income threshold for substantial gainful
     activity.

17

1    The Commissioner responds that ALJ Webster appropriately evaluated Hawkins' and

2    Canty's opinions in the context of the evidence as a whole before concluding that Canty's

3    opinion was more consistent with Plaintiff's longitudinal medical history and her record of

4    minimal treatment of her psychological problems over the years.  The Court agrees with the

5    Commissioner that ALJ Webster appropriately analyzed Hawkins' and Canty's opinions in the

6    context of the case as a whole and that substantial evidence supported the ALJ's findings.

7        **Applicable law.**  An ALJ is "not bound by an expert medical opinion on the ultimate

8    question of disability."  *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); Social Security

9    Ruling 96-5p.  The regulations provide that medical opinions be evaluated by considering (1) the

10   examining relationship; (2) the treatment relationship, including (a) the length of the treatment

11   relationship or frequency of examination, and the (b) nature and extent of the treatment

12   relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that

13   support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

14       Three types of physicians may offer opinions in social security cases: "(1) those who

15   treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the

16   claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant

17   (nonexamining physicians)."  *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally

18   entitled to more weight than the opinion of a doctor who examined but did not treat the claimant,

19   and an examining physician's opinion is generally entitled to more weight than that of a non-

20   examining physician.  *Id.*  The Social Security Administration favors the opinion of a treating

21   physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d

22   625, 631 (9th Cir. 2007).  A treating physician is employed to cure and has a greater opportunity

23   to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

24   Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or

25   the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

26       Once a court has considered the source of a medical opinion, it considers whether the

27   Commissioner properly rejected a medical opinion by assessing whether (1) contradictory

28   opinions are in the record; and (2) clinical findings support the opinions.  The ALJ may reject the

1    uncontradicted opinion of a treating or examining medical physician only for clear and

2    convincing reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.

3    Even though the treating physician's opinion is generally given greater weight, when it is

4    contradicted by an examining physician's opinion that is supported by different clinical findings

5    the ALJ may resolve the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The

6    ALJ must set forth a detailed and thorough factual summary, address conflicting clinical

7    evidence, interpret the evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.  Without

8    specific and legitimate reasons to reject the opinion, the ALJ must defer to the treating or

9    examining professional.  *Lester*, 81 F.3d at 830-31.  The ALJ need not give weight to a

10   conclusory opinion supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111,

11   1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

12        **The ALJ's decision.**  ALJ Webster followed these guidelines.  After providing detailed

13   summaries of Plaintiff's medical records from KCMH and Sierra Vista clinic, of the reports of

14   consultative examinations by Hawkins and Canty, and the conclusions of the state agency analyst

15   and reviewing consultants, ALJ Webster wrote:

16        In evaluating the evidence about the claimant's mental capacity, I give some
          weight to the treating evidence from Sierra Vista and Sacramento Community
17        Health.  These records show that the claimant was routinely prescribed anti-
          depressive and anti-anxiety medications, with little observation of her actual
18        symptoms.  The Sierra Vista notes from June 2004 to June 2005 contain no
          mention of the claimant's depressive or anxiety symptoms, though reflecting in
19        July 2005 that she had an anxiety attack.  Weight is given to [the] consultative
          psychologist's diagnostic finding after testing that the claimant had borderline
20        intellectual functioning; this is consistent with the earlier Mental Health
          observation that her mental acuity was slightly below normal.  However, Dr.
21        Hawkins's proposed limitations on the claimant's ability to maintain
          concentration, keep to schedule, withstand stress, and adapt to change are rejected.
22        These limitations are inconsistent with claimant's minimal level of psychiatric
          treatment, before and after Dr. Hawkins's evaluation.  Further, his observations in
23        2003 are contradicted by Dr. Canty's at the 2006 consultative psychiatric
          evaluation, when the claimant's mental status and behavior were essentially
24        normal.  Greater weight is given to Dr. Canty's opinion that the claimant could
          perform simple repetitive tasks and interact appropriately with others.  The 2006
25        state agency opinion is essentially in accord, though it placed restrictions on the
          claimant's ability to deal with the public, which is not supported in the record.  In
26        making this finding, I have considered the claimant's testimony about her
          symptoms and limitations and the extent to which it is consistent with the
27        objective medical evidence and other evidence.

28        AR 339 (*citations to administrative exhibits omitted*).

After further discussion of Plaintiff's physical limitations, the ALJ continued:

The claimant did not testify to current psychological limitations, but in 2002 and 2006 her written statements about her functioning showed difficulties being around strangers, and problems with memory and concentration. However, the claimant's work history and the findings at the 2006 consultative psychological evaluation contradict her written assertions; her jobs have always involved public interaction, and she had no deficits in memory or concentration in the examination.

I have also considered the Third Party Statements completed about the claimant's functioning [c]ompleted in July 2002 by a cousin and in March 2006 by her teenage daughter. The cousin indicated that the claimant was reluctant to leave the house by herself, but that she did crosswords and puzzles for entertainment; these characteristics do not comprise any sort of disability. Daughter Shaniece Griggs stated her mother required daily assistance to care for the rest of the children and do housework; that she had panic attacks, was often agitated, and had multiple physical limitations. However, Griggs also stated that the claimant prepared grocery lists and paid bills, and supervised the daughter's shopping trips. I give little weight to the physical limitations given to the claimant because they do not correspond to her chronic impairments or symptoms in the medical records. Further, the fact that Plaintiff needed help to get five children ready for school is not necessarily proof of disability; especially when two of the children are themselves disabled.

AR 339-40 (*citations to administrative exhibits omitted*).

Plaintiff concedes that the ALJ explained his reasons for rejecting Hawkins' opinions but takes issue with the factual finding that Plaintiff had a "minimal level of psychiatric treatment" before and after Hawkins prepared his report. She argues that her consultation with KCMH and her treating physicians' routine prescription of Paxil are sufficient evidence of treatment for her anxiety and depression, citing *Sprague* for the proposition that the ALJ should have credited her treating physicians' records summarily reporting depression and generalized anxiety and prescribing Paxil. This case is factually distinguishable from *Sprague* in several ways.

The *Sprague* decision is most often cited when a claimant alleges disability resulting from a combination of interrelated physical and mental impairments. Mrs. Sprague argued that the ALJ's analysis failed to integrate Sprague's combination of physical and mental impairments. Mrs. Sprague's treating physician, Dr. Gehlen, opined that her physical condition, combined with her pain and depression rendered her totally disabled. 812 F.2d at 1228. Gehlen emphasized that Mrs. Sprague's disability arose from the combination of physical and psychological problems, which did not individually disable her, but collectively rendered her completely disabled. One

examining physician, Dr. Shibata, concurred, opining that Mrs. Sprague's lower back problems

rendered her unemployable. *Id.* The other examining physician, Dr. McCornack, an orthopedist,

addressed only Sprague's physical impairments and opined that Mrs. Sprague could not perform

strenuous work but could do a variety of sedentary work activities. *Id.* McCornack did not

address Sprague's mental state. *Id.* at 1230. The Ninth Circuit court agreed, holding that the

ALJ erred in rejecting the treating physician's assessment of Plaintiff's abilities in light of her

combined physical and mental impairments.

      Here, Plaintiff is not arguing that ALJ Webster should have considered her physical and

mental impairments collectively. Indeed, Plaintiff has never contended that her anxiety,

depression, and intellectual limitations are attributable to her physical impairments. Nor does

any evidence suggest that Plaintiff's mental or psychological limitations are the result of one or

more of her various alleged physical impairments.

      Second, the Ninth Circuit found the ALJ's analysis of the record in Mrs. Sprague's case

to fall short of the findings necessary to set aside a treating physician's opinion. Quoting with

approval the circuit's rule that "[i]f the ALJ wishes to disregard the opinion of the treating

physician, he or she must make findings setting forth specific, legitimate reasons for doing so

that are based on substantial evidence in the record," the appellate court found that the ALJ's

opinion included no specific reasons for rejecting Gehlen's opinion. *Id.* at 1230, *quoting Murray*

*v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). The court emphasized that the examining

physicians' opinions did not contradict Gehlen's opinion since only Gehlen offered evidence of

Sprague's pain and mental condition and it disabling effect when combined with her physical

limitations. *Sprague*, 812 F.2d at 1230. Here, Plaintiff does not argue that the ALJ failed to set

forth reasons for disregarding the opinions of her treating physician: her treating physicians did

not provide opinions. Instead, Plaintiff contends that the ALJ should have favored the opinion of

the single examining physician who agreed with her contention that her mental condition

rendered her disabled, despite conceding that the ALJ fully set forth his reasoning for rejecting

Hawkins' opinion in light of its inconsistency with other medical opinions and Plaintiff's failure

///

1  to follow both her treating physicians' and Hawkins' recommendations to secure treatment for
2  her mental impairments.

3      Put another way, Plaintiff here does not contend that ALJ Webster failed to include
4  specific reasons for his decision, she contends that his reasons and decisions were wrong.  As
5  noted above, she specifically objects to the determination that treatment for her mental
6  impairments was minimal.

7      Plaintiff contends that accepting routine prescriptions for anti-depressant and anti-anxiety
8  medications was sufficient treatment for her allegedly disabling anxiety and depression.  She is
9  wrong.  An ALJ may consider "unexplained, or inadequately explained, failure to seek treatment
10  of follow a prescribed source of treatment."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).
11  Where a claimant's mental health records showed only two or three visits for therapy over a two-
12  and-a-half-year period, the ALJ's determination that the claimant had very little mental health
13  treatment was supported by substantial evidence.  *Calvento v. Astrue*, 2009 WL 2868726 at *9
14  (E.D. Cal. September 2, 2009) (No. CIV S-08-0678 GGH).  In *Calvento*, the court found that the
15  ALJ properly discounted the claimant's subjective complaints of mental disability when she
16  stopped attending therapy after two or three sessions, claiming other group members told her she
17  was not welcome, since the claimant could have secured another therapy source if she was "truly
18  in need of serious help."  *Id.*

19      Following the KCMH assessment in July 2002, which recommended multiple therapies to
20  address Plaintiff's mental impairments, Plaintiff failed to attend any therapy at all, claiming that
21  she did not have a car when KCMH evaluated her and testifying that, "I don't catch the bus."
22  Notably, although Plaintiff testified at the October 2003 hearing that her husband then had a car,
23  she did not seek further treatment once the car was available.  Nor did transportation issues
24  prevent Plaintiff from going "from doctor to doctor" to attend to her physical ailments.  ALJ
25  Webster's finding that Plaintiff sought very little mental health treatment, and the logical
26  conclusion that Plaintiff's anxiety and depression were not severe enough to truly disrupt her
27  functioning, was supported by substantial evidence.
28  ///

22

1      Third, the *Sprague* court rejected the ALJ's determination that "no psychiatric or other

2 qualified evidence" was produced to support Sprague's claim of mental impairment as "clearly

3 erroneous." 812 F.2d at 1232.  "Under general principles of evidence law," said the court, "Dr.

4 Gehlen is qualified to give a medical opinion as to Mrs. Sprague's mental state as it relates to her

5 physical disability even though Dr. Gehlen is not at psychiatrist." *Id.*

6      Plaintiff hangs her hat on the last proposition, arguing that ALJ Webster erred in rejecting

7 her treating physicians' opinions.  The problem is that, unlike Mrs. Sprague, Plaintiff's treating

8 physicians did not express any opinion relating her depression or anxiety to her ability to perform

9 gainful activity, they simply entered brief notes in her treatment records.  Diagnostic notes in

10 Sprague's treatment records supported the opinion expressed by her treating physician:

11 diagnostic notes in Plaintiff's medical records stand alone.  *See Id.* at 1232 ("Dr. Gehlen's

12 opinion is competent psychiatric evidence, based on his clinical observations of Mrs. Sprague's

13 depression.")  Because neither Clinica Sierra nor the Sacramento Clinic offered an opinion

14 regarding any effect of Plaintiff's anxiety and depression on her ability to work, their clinical

15 observations have no opinion to support.

16      In addition, the *Sprague* court observed that Gehlwen's opinion was based on objective

17 findings.  812 F.2d at 1232.  Neither Clinica Sierra's nor Sacramento Clinic's records of

18 Plaintiff's treatment document any objective evidence of depression or anxiety, such as

19 administration of any psychological tests, or even observations of Plaintiff's demeanor: the

20 diagnosis appears to be based solely in Plaintiff's subjective complaints and reports.  KCMH, to

21 which Clinica Sierra referred Plaintiff for consultation, also appears to have based the opinions in

22 its intake interview solely on Plaintiff's self-reports.  Although Hawkins administered tests to

23 objectively assess Plaintiff's intellectual functioning, he relied on KCMH's intake report and his

24 interview of Plaintiff for his assessment of her depression and anxiety.  And according to

25 Hawkins, Plaintiff's emotional difficulties, not her intellectual limitations, interfered with her

26 undertaking gainful employment.

27      To be entitled to benefits, a claimant must have an impairment severe enough to

28 significantly limit his or her physical or mental ability to basic work activities.  *See* 20 C.F.R. §

416.920(c).  Considered in the absence of a medical provider's opinion of severity, the diagnostic

observations in Plaintiff's medical records are sufficient to establish the existence of an

impairment, but not its severity.  A plaintiff's personal opinion is not sufficient to establish the

impairment's severity.  *See* 20 C.F.R. § 416.908.

> Historically, the courts have recognized conflicting medical evidence, the absence
> of regular medical treatment during the alleged period of disability, and the lack of
> medical support for a doctor's report based substantially on a claimant's
> subjective complaints as specific, legitimate reasons for disregarding the treating
> physician's opinion.  *Flaten*, 44 F.3d at 1463-64; *Fair v. Bowen*, 885 F.2d 597,
> 604 (9th Cir. 1989).  The ALJ is not required to accept the opinion of a treating or
> examining physician if that opinion is brief, conclusory and inadequately
> supported by clinical findings.  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir.
> 2002).

> *Morehead v. Astrue*, 2008 WL 3891464 at *5 (E.D.Wash. August 19, 2008) (No. CV-07-
> 3032-CI).

To paraphrase *Fair*, an ALJ cannot be required to believe every claimant's otherwise

unsupported allegation of disabling depression or anxiety, lest disability benefits be available for

the asking, a result plainly contrary to 42 U.S.C. § 423 (d)(5)(A).  *Cf.* 885 F.2d at 603.

The *Sprague* court specifically criticized the ALJ for failing to credit Mrs. Sprague's

statements about her own mental and physical limitations and her pain and depression since the

medical evidence established physical conditions that would normally be expected to cause pain.

812 F.2d at 1231.  When medical evidence of a claimant's mental state substantiates the

claimant's testimony, an ALJ must consider the effect of the claimant's mental state on her

physical ability to perform gainful activities.  *Id.* at 1231.  In Plaintiff's case, however, her own

opinions are the sole evidence of her claimed depression and anxiety.

Finally, as ALJ Webster found, Plaintiff's personal history belied her claims of disabling

anxiety and depression and the opinions based on her personal representations of her mental

condition.  Plaintiff consistently worked and consistently worked in positions requiring

interaction with co-workers and the public.  She performed well enough in her fast-food jobs to

have held jobs as lead worker and supervisor.  She was trusted to care for the children of others.

She was able to read newspapers and other material, enjoyed scary movies and Discovery

channel programs, and worked crossword puzzles.  Her cousin Tyana Larry described her ability

to be "the best mom."  Her psychological problems never bothered her enough to pursue psychiatric or psychological therapy.  Consistent with evidence of Plaintiff's personal history, psychologist Canty described Plaintiff as nearly normal, tellingly noting that her level of symptoms would not interfere with work "she was highly motivated to perform."

If medical reports are inconclusive, the Commissioner alone resolves questions of credibility and conflicts in testimony.  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  Here, ALJ Webster elected to reject Hawkins' opinion as inconsistent with the balance of the evidence.  Substantial evidence supported his decision.

**III.   Conclusion and Order**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.


IT IS SO ORDERED.

**Dated:    April 26, 2011            /s/ Sandra M. Snyder**
UNITED STATES MAGISTRATE JUDGE